**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PETER M. BORDEN,<br><br>Plaintiff,<br><br>v.<br><br>GEORGE W. MOORE,<br><br>Defendant,<br><br>PGEM, LLC; and 616 INVESTMENT PARTNERS, LLC,<br><br>Nominal Defendants. | Case No. 2:26-CV-8046<br><br>**JURY TRIAL DEMANDED** |

**CIVIL ACTION COMPLAINT**

Plaintiff, Peter M. Borden ("***Borden***" or "***Plaintiff***"), by and through his undersigned counsel, hereby files this civil action complaint against Defendant George W. Moore ("***Moore***" or "***Defendant***") (Borden and Moore are collectively referred to as "***Partners***"), and Nominal Defendants, PGEM, LLC ("***PGEM***" or the "***Company***") and 616 INVESTMENT PARTNERS, LLC ("***616***," and collectively with PGEM, "***Nominal Defendants***"), and in support thereof avers as follows:

**INTRODUCTION**

Plaintiff and Defendant are 50/50 partners in two LLCs: (1) PGEM; and (2) 616. PGEM was formed by the partners in 2007 and owns, indirectly through several LLCs, assets consisting of Forty 1° North, a 28-room boutique hotel with two restaurants, event space and a marina in Newport, Rhode Island ("***41 North***"). 616 was formed by the Partners in 2018 and is an investment vehicle that the Partners established as a cash reserve to support PGEM in its operation of 41

North. The Operating Agreements for both PGEM and 616 provide that the Partners have equal and joint management rights. Both Operating Agreements contain a "deadlock" provision that provides for dissolution if the Partners are unable to agree on any "major action" related to governance or operation of the Company.

In recent years, the Partners' joint management of PGEM has broken down, mainly because Defendant has stalled and refused to engage with Plaintiff on key decisions to effectively manage PGEM. The Defendant will not engage on key operational issues facing PGEM such as: (1) a dispute over the day to day management of PGEM and Defendant's refusal to hire a professional management company for PGEM; (2) a dispute over personnel decisions, including Defendant's unilateral hiring of a general manager and delegation of management to consultants without Plaintiff's approval; (3) a dispute over the financing needs for PGEM by exploring the opportunity to raise capital for PGEM from potential equity investors as opposed to bank financing; and (4) a dispute over addressing 41 North's needed upkeep and maintenance. The partners are now not only at an impasse on several major decisions regarding PGEM but have had a breakdown of their relationship which prevents them from effectively working together to operate the business.

With respect to 616, Plaintiff no longer wishes to be in an investment partnership with Defendant and has demanded that 616 be dissolved and its assets distributed, which is within his rights to request. Defendant refuses to do so.

After years of deteriorating relations between the Partners, long-festering management disagreements about the business have come to a head. Plaintiff attempted to follow the dispute resolution provisions of the Operating Agreements to resolve the disagreements. While Defendant's response to Plaintiff's various attempts to raise business issues as such has alternated between condescension and stony silence, his response to Plaintiff's attempts to observe the terms

of their contract has been to fight Plaintiff at every turn. Defendant now refuses to honor the terms of the deadlock provisions.

In addition to the deadlock on major operational actions for the Partnerships, the Partners have fundamental disagreements about strategic direction. Plaintiff intended, and believed the Partners intended, to sell 41 North shortly after their prior financing matured in 2021. He never intended to hold it indefinitely. Now, Defendant refuses to even consider offers to purchase the business and dodges or dismisses Plaintiff's attempts to discuss future plans. In so doing, Defendant relies on the lone exception to the co-equal management provisions in the PGEM Operating Agreement, which gives Defendant the "final decision" on the "decision to sell all or substantially all of the assets of the Company … or … change in the purpose of the Company." That provision, however, was drafted by Defendant, a lawyer, with the assistance of counsel who acted on Defendant's instruction even while purporting to represent only the business entity, and is unenforceable. Moreover, even if enforceable, Defendant has breached his duty of good faith and fair dealing by refusing to consider whether to sell or even entertain interest from third parties in purchasing PGEM's assets, instead placing his desire to control the business as his legacy over the interest of his partner.

Defendant's conduct has left Plaintiff trapped in dysfunctional partnerships with no cooperation, no way to exit and no recourse except this action to enforce the deadlock provisions of the partnership agreements. Plaintiff now seeks the relief to which he is entitled: a declaration that the respective operating agreements of PGEM and 616 require dissolution of both entities; an order compelling the Partners to carry out the dissolution and winding up of both companies; damages for Defendant's breaches of the operating agreements; and a declaration that Defendant's unilateral sale authority—a provision that Defendant has invoked to justify his broad disregard of

Plaintiff's contractual rights—is unenforceable or, at minimum, narrowly limited to the sale decision itself.

## PARTIES

1. Plaintiff Peter M. Borden is an individual and a citizen of the State of Florida. He resides in Lakewood Ranch, Florida.

2. Defendant George W. Moore is an individual and a citizen of the Commonwealth of Pennsylvania. He resides in Philadelphia, Pennsylvania.

3. Nominal Defendant PGEM, LLC is a Delaware limited liability company. PGEM is named only so that the Court may bind the entity to declarations concerning its operating agreement (the "***PGEM Operating Agreement***") and to any dissolution, liquidation, distribution, or related equitable relief.

4. Nominal Defendant 616 Investment Partners, LLC is a Delaware limited liability company. 616 is named only so that the Court may bind the entity to declarations concerning its operating agreement (the "***616 Operating Agreement***") and to any dissolution, liquidation, distribution, or related equitable relief.

## VENUE AND JURISDICTION

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Borden is a citizen of Florida, and Moore is a citizen of Pennsylvania. Plaintiff and Defendant do not share the same State citizenship.

7. The amount in controversy exceeds $75,000 because this action concerns Borden's 50% membership interest in PGEM, the dissolution and distribution of PGEM's assets, the

dissolution and distribution of 616's assets and Moore's personal liability for the relief sought. The value of those rights substantially exceeds the jurisdictional threshold.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Moore resides in Philadelphia, Pennsylvania, within the Eastern District of Pennsylvania.

9. Jurisdiction and venue are also proper in this Court pursuant to the PGEM Operating Agreement, a true and correct copy of which is attached hereto as Exhibit A, and the 616 Operating Agreement, a true and correct copy of which is attached hereto as Exhibit B. *See* Ex. A, § 17.06; Ex. B, § 17.06.

## ALLEGATIONS

10. Borden and Moore are 50/50 partners in PGEM, a Delaware limited liability company and 616, a Delaware limited liability company.

11. Borden and Moore met in early 1999 in connection with work for the late philanthropist Dorrance H. Hamilton ("***Mrs. Hamilton***").

### Plaintiff Peter M. Borden

12. Borden started his career in the construction industry.

13. In the late 1980s, Borden's construction company began renting office space from Mrs. Hamilton, who became acquainted with his work.

14. In 1999, Mrs. Hamilton chose Borden as her project manager for the restoration of the historic Swiss Village in Newport, Rhode Island, a large project that was important to Mrs. Hamilton.

15. The project took years to complete, and during that time Borden's relationship with Mrs. Hamilton deepened: Borden served as Mrs. Hamilton's project manager on numerous projects in Newport and Boca Grande, Florida.

16. In 2001, Mrs. Hamilton transitioned the Swiss Village into a 501(c)(3) non-profit called the SVF Foundation.

17. She eventually asked Borden to serve as the executive director of the SVF Foundation.

**Defendant George W. Moore**

18. Moore is a real estate lawyer who previously practiced law at Morgan, Lewis & Bockius LLP ("Morgan Lewis").

19. While at Morgan Lewis, Moore represented Mrs. Hamilton in various matters, including Swiss Village related issues.

20. Mrs. Hamilton asked Moore to join the board of the SVF Foundation, and he eventually served as board chair.

21. On information and belief, in or after 2006, Moore left Morgan Lewis to become an in-house counsel at Mrs. Hamilton's family office.

**Borden and Moore Develop a Close Personal Relationship**

22. Borden and Moore began to develop a close working relationship through their work together on the SVF Foundation where Borden served as the executive director and Moore served as the board chair. In these roles, Moore effectively supervised Borden.

23. That relationship matured into a close personal friendship in which Borden developed trust for Moore and would turn to him for advice on operational issues confronting the SVF Foundation.

24. Borden also relied on Moore for legal advice on issues related to the SVF Foundation and later began to rely on Moore for advice on issues related to his own personal legal affairs, including a real estate purchase in Florida.

**Company Formation and Background**

25. In 2006, Mrs. Hamilton learned of a marina and restaurant property for sale in the center of Newport and decided to acquire it.

26. Mrs. Hamilton engaged Borden and Moore to jointly oversee redevelopment of the property, including the addition of a boutique hotel, and in exchange she agreed to pay them a development fee and a 3% equity stake (1.5% for each Partner).

27. The development fee was to be paid upon completion of construction, and the equity would be paid on eventual sale of the property.

28. During 2006 and 2007, several entities were formed to facilitate the ownership, development and operation of the new business: (1) PGEM, the Borden-Moore investment vehicle; (2) 802 Partners, LLC, the owner of the real estate; and (3) its wholly-owned subsidiary Forty 1° North, LLC, lessor of the real estate and operator of the hotel. Initially, 802 Partners, LLC was owned 97% by Mrs. Hamilton and 3% by PGEM.

29. Borden and Moore then oversaw construction, and the boutique hotel, 41 North, opened in 2010.

30. During this time, Borden and Moore worked closely together on most aspects of the project. However, Moore dealt with the legal issues that arose.

31. In 2013, Mrs. Hamilton's representatives told Borden and Moore that it was time for her to exit her investment.

32. Her office proposed that she would sell her 97% interest in the property to them and offer seller financing to facilitate a transaction they otherwise could not afford.

33. In 2014, Borden and Moore agreed to cause PGEM to buy out Mrs. Hamilton's interest in 802 Partners, LLC for approximately $14.5 million, which included a $12.5 million promissory note to Mrs. Hamilton plus the repayment of the $2 million development fee.

34. Since 2015, PGEM has been the sole member of 802 Partners, LLC, which in turn remains the sole member of Forty 1° North, LLC.

35. In 2015, Borden and Moore, newly minted as equal joint owners of the hotel, amended and restated the operating agreements of those entities to establish governance rights going forward.

36. Because PGEM is the top-level entity, decisions made by the Partners at the PGEM level, under the PGEM Operating Agreement described below, determine how the business is run.

37. The Hamilton loan matured on December 31, 2021, and included a two-year tail period (through 2023) during which Mrs. Hamilton's estate would have been entitled to a share of the proceeds of a sale.

38. The Partners repaid the Hamilton loan in 2021 with proceeds of a term loan from Citizens Bank, described below.

**The PGEM Operating Agreement**

39. Pursuant to the PGEM Operating Agreement, Borden and Moore are PGEM's only Members, each holding a 50% Percentage Interest. Ex. A § 3.01, Ex. A.

40. Each Member may designate a Manager, and each has designated himself. *Id.* § 9.01.

41. **Section 9.02(a)** of the PGEM Operating Agreement provides: "The management of the business and affairs of the Company shall be the sole and complete responsibility of the Managers. Except as otherwise provided in Section 12.01 herein, any action of the Managers shall require the unanimous approval of the Managers."

42. **Section 12.01** (the "***Deadlock Provision***") addresses managerial disagreements over major actions.

43. The Deadlock Provision provides in relevant part:

> Except as hereinafter provided, in the event that the Managers are not able to agree upon any major action proposed to be taken, or consent to be given, by the Managers in the conduct of the governance or operations of the Company, either Manager may give notice in writing to the other Manager of such disagreement. In the event that the Managers are unable to agree within twenty (20) days of such written notice (the "Disagreement Notice"), the Managers first submit the disagreement to informal mediation to be administered by Frederick Masters, Esquire.[1] In the event the Managers cannot resolve the disagreement via informal mediation with Frederick Masters within thirty (30) days of the Disagreement Notice, then the Managers shall submit the disagreement to mediation administered by JAMS under its mediation rules. In the event the Managers cannot resolve the disagreement via mediation within one hundred (100) days of the Disagreement Notice, then the Company shall be dissolved, as provided in Article XV.

44. While PGEM vests the Partners with equal management rights on virtually every decision for the Company, there is one notable exception. Section 12.01 goes on to provide:

> Notwithstanding the above provisions of this Section 12.01, in the event that the decision that the Managers are unable to agree upon relates to a (i) decision to sell all or substantially all of the assets of the Company, 802 Partners, LLC, or Forty 1° North, LLC, or sell all of the membership interests in any of the aforesaid companies or (ii) change in the purpose of the Company, then Moore shall have the final decision
>
> (the "***Sale Authority Provision***").

45. Section 12.01 does not give Moore final authority over every major management action or over dissolution that occurs due to deadlock.

46. **Section 15.01** provides in relevant part: "The Company shall dissolve and its affairs shall be wound up on the first to occur of the following: (a) the written consent of the Managers or the Majority-In-Interest; (b) as provided in Section 12.01 above; and (c) entry of a decree of judicial dissolution of the Company under the Act."

[1] Mr. Masters has since retired from practicing law. Moreover, Mr. Masters, former real estate partner at Buchanan, Ingersoll & Rooney PC, would clearly be conflicted from mediating a dispute over instruments he assisted in drafting.

47. **Section 15.02** governs liquidation and distributions of the PGEM account, providing in relevant part: "On dissolution of the Company, the Managers shall act as liquidators or may appoint one or more Members as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act."

**Drafting of the PGEM Operating Agreement and Conflict of Interest**

48. In 2015, Moore and Borden, at Moore's suggestion, hired the law firm of Buchanan Ingersoll & Rooney PC ("***Buchanan***") to draft amendments to the PGEM Operating Agreement that would bring it to its current form.

49. At this time, and prior thereto, Borden trusted Moore, relied on Moore to make legal decisions for the Partners and believed that Moore was acting in Borden's best interest. Borden based this understanding on the fact that Moore had previously handled legal issues for 41 North and Borden was used to getting advice from Moore on matters related to the hotel, his personal affairs and the SVF Foundation.

50. As a result, Borden understood that Moore would primarily direct Buchanan in the drafting process of the amendments to the PGEM Operating Agreement. Moore served as the Partners' point person with Buchanan and engaged with firm lawyers on a variety of drafting discussions in which Borden was not a participant.

51. Indeed, the Buchanan lawyer who was in charge of drafting the amendments consulted with Moore during the drafting process before sharing draft provisions, including the Deadlock Provision, with Borden.

52. On November 12, 2015, the lead Buchanan lawyer shared drafts of several documents, including the PGEM Operating Agreement, with Borden, stating: "My drafts have been based on my discussions with George."

53. On November 17, 2015, the same Buchanan lawyer shared a standard deadlock provision, which included a mechanism whereby one partner could buy out the other, with Borden but stated: "George and I had discussed this generally as a form of deadlock provision, but I believe we concluded that it may not be practical." The Buchanan lawyer never explained to Borden why he thought a deadlock provision with a buyout mechanism "may not be practical" or whether it was in Borden's best interest.

54. Rather than use the standard deadlock provision that Buchanan initially discussed with Moore, Moore suggested the Partners adopt a deadlock provision that gave him sole control over the decision of whether, when and how to sell the business. He justified the provision to Borden by emphasizing his legal and real-estate experience and told Borden that his legal experience put him in the best position ultimately to make this decision for the Partners.

55. For instance, in or around Fall 2015, Moore told Borden that Buchanan had the details worked out, with the only remaining issue being how the Partners would decide when to sell. Moore told Borden that the only viable option was to give Moore the authority to make the decision based on his experience as a real estate attorney. Moore did not explain why he believed this to be the only option, or a better option than joint decisions, or why such a provision might be in Borden's interest.

56. Borden was not represented by separate counsel in the negotiation and drafting of the PGEM Operating Agreement and none of the lawyers who were involved (neither Moore nor the Buchanan firm) explained to Borden how vesting Moore with sole authority over a sale, or the Sale Authority Provision specifically, could severely harm him in the future or lock him into the investment. Similarly, they did not explain, and Borden did not appreciate, the unfairness of the

provision or how unusual such a provision was in a deal where the partners invested equally, as Moore was getting enhanced rights in exchange for no consideration.

57. Borden did not question the provision because he trusted Moore, not only as his friend and partner, but also as the person to whom he had long deferred on legal matters. Throughout their relationship, going back to their joint work on the SVF Foundation and the development of 41 North, Moore routinely made the decisions on legal matters.[2] This continued through the time that the parties amended the PGEM Operating Agreement. During that time, Borden thought that Moore was handling the amendment for both of the partners and he believed that Moore was looking out for their joint interests. In addition, Borden was not concerned about the provision because he thought that he and Moore were completely aligned on when to sell.

58. Had Borden understood all the implications of the provision or that Moore would later use the Sale Authority Provision to domineer operational decision-making, disregard co-equal management rights, block dissolution and deny Borden any exit mechanism, Borden would not have agreed to the provision in its current form.

59. The resulting language gave Moore unilateral authority over a sale but gave Borden no corresponding right to require a sale, no defined buy-sell mechanism, no set term and no clear exit if Moore, reasonably or unreasonably, refused to sell.

60. As constructed by Moore and the Buchanan firm, Borden's only certain exit is upon his death, at which point his heirs will have even fewer rights to exit PGEM than he does today.

[2] Indeed, Borden's reliance on Moore for legal matters also extended to several of Borden's personal transactions as well, including the purchase of a motorboat and the purchase of his house in Florida.

**The 616 Operating Agreement**

61. 616 was established by Borden and Moore in 2018 as an entity with a purpose of holding investments. *See* Ex. B at 1 (dated March 5, 2018).

62. In practice, the Partners have used it as a cash reserve to hold funds in case needed in PGEM's business. That need has not arisen to date. This cash reserve is not required to be maintained by any third party.

63. 616 currently holds approximately $3 million. 41 North's operating accounts currently hold approximately $6.1 million, which is well in excess of working capital requirements.

64. 616 does not actively trade investments, has no operations or subsidiaries, and, other than as a cash reserve for PGEM, the Partners have no reason to maintain it.

65. Borden and Moore are 616's only Members, each holding a 50% Percentage Interest. Ex. B § 3.01, Ex. A.

66. Each Member may designate a Manager, and each has designated himself. *Id.* § 9.01.

67. The 616 Operating Agreement likewise requires unanimous Manager approval for any action by the Managers, Ex. B § 9.02(a), with a narrow exception that gives Moore final authority only if a disputed decision concerns distributing or lending funds to PGEM, 802 Partners, LLC, or Forty 1° North, LLC. *Id.* § 12.01.

68. In relevant part, **Section 12.01** of the 616 Operating Agreement provides:

> Except as hereinafter provided, in the event that the Managers are not able to agree upon any major action proposed to be taken, or consent to be given, by the Managers in the conduct of the governance or operations of the Company, either Manager may give notice in writing to the other Manager of such disagreement. In the event that the Managers are unable to agree within twenty (20) days of such written notice (the "Disagreement Notice"), the Managers first submit the disagreement to informal mediation to be

> administered by Frederick Masters, Esquire. In the event the Managers cannot resolve the disagreement via informal mediation with Frederick Masters within thirty (30) days of the Disagreement Notice, then the Managers shall submit the disagreement to mediation administered by JAMS under its mediation rules. In the event the Managers cannot resolve the disagreement via mediation within one hundred (100) days of the Disagreement Notice, then the Company shall be dissolved, as provided in Article XV.

69. While 616 vests the Partners with equal management rights on virtually every decision for the Company, there is one notable exception. Section 12.01 goes on to provide:

> Notwithstanding the above provisions of this Section 12.01, in the event that the decision that the Managers are unable to agree upon relates to distributing or lending funds to PGEM, LLC, 802 Partners, LLC or Forty 1° North, LLC, then Moore shall have the final decision

(the "***616 Funding Authority Provision***").

70. Notably, this provision is different than the Sale Authority Provision that appears in the PGEM Operating Agreement, in that it only applies to decisions to distribute or lend funds to those listed entities.

71. **Section 15.01** provides in relevant part: "The Company shall dissolve and its affairs shall be wound up on the first to occur of the following: (a) the written consent of the Managers or the Majority-In-Interest; (b) as provided in Section 12.01 above; and (c) entry of a decree of judicial dissolution of the Company under the Act."

72. **Section 15.02** governs liquidation and distributions of the 616 account, providing in relevant part: "On dissolution of the Company, the Managers shall act as liquidators or may appoint one or more Members as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act."

**Despite Promises, Moore Will Not Even Consider Selling the Company**

73. From the time that they acquired the property from Mrs. Hamilton in 2014, Borden and Moore had decided that they would only hold the property for a short period of time and

WOULD sell it after the Hamilton loan matured and the subsequent two-year Hamilton sale participation tail expired.

74. In the Fall of 2021, the Hamilton loan was approaching maturity and the Partners were discussing the terms of the replacement bank financing. Borden told Moore he was concerned about agreeing to a loan term significantly longer than the Partners envisioned holding the asset. After reassurances from Moore that they would sell the business prior to the end of the full loan term, Borden agreed to a five-year loan with Citizens Bank (maturing in December 2026).

75. On or around February 1, 2023, Borden and Moore met at the 41 North property, and Borden asked Moore whether he had given further thought to selling the business. Moore reassured Borden that he envisioned a sale in two years' time, stating "I said two years and I meant it." Borden was encouraged by this reaffirmation of their shared plan.

76. The Hamilton sale participation tail expired at the end of 2023.

77. The Partners regularly receive outreach, inquiries and indications of interest from prospective purchasers, both in writing and orally.

78. Over the last three years, rather than moving toward a sale process as the Partners had previously agreed, Moore has tacked in the other direction. Recently, Moore has refused to even consider third-party interest, telling Borden that "now is not the time."

79. In or around August 2025, a representative of another prospective purchaser contacted the Company to express interest in acquiring 41 North.

80. Moore refused to engage with that representative and later stated to Borden that he had told the representative that "there was nothing to say, we aren't selling."

81. Moore's refusal occurred without a serious conversation with the prospective buyer; Moore did not explore pricing or other terms, or consult Borden.

82. Moore's refusal to even consider offers is based on his own interest in holding 41 North as his personal "legacy," and he has not considered the best interests of both Partners.

83. On September 19, 2025, during a lengthy telephone call, Moore told Borden: "You have a son, I don't. This is all I have. It's a legacy to Mrs. Hamilton as well."

84. Then Moore stated he envisioned "another four years" of ownership, until "we'll both be 70."

85. Borden responded that such a timeline (i.e., the end of 2029) was unacceptable and that he did not consider a refinancing or extension of the existing Citizens bank loan to be a viable option.

86. Via email on September 25, 2025, Borden reiterated his position that refinancing was not a viable option.

87. In the winter and spring of 2026, the Partners were working through a loan covenant compliance matter with Citizens. Although there were discussions between the Partners about a potential loan extension paired with amendments to the Operating Agreements to address Borden's exit rights, no agreement was reached.

88. In May 2026, Borden and Moore received a written indication of interest to purchase the hotel at a valuation that was attractive to Borden.

89. Borden wished to evaluate this opportunity, but Moore again refused to even explore the offer or engage with the potential buyer.

90. Moore's conduct reflects his insistence on retaining control of 41 North and treating it as his personal legacy project, rather than evaluating whether a sale or third-party investment benefits the Partners.

91. Moore has placed his personal attachment to running the business above Borden's interests and has caused him to resist any exit or sale to the detriment of Borden.

92. Moore has not consulted with Borden as to potential enterprise value, sought a third-party valuation, taken steps to compare the available alternatives or considered any process to determine whether the Partners should sell PGEM or its assets. Moore has similarly resisted any attempt to determine if the property has appreciated in value since its last appraisal in 2021.

**Breakdown of Joint Management**

93. Despite their joint management authority under the PGEM Operating Agreement, Moore in recent years has stopped treating Borden as an equal Manager.

94. Over the last several years, Moore has become increasingly unwilling to discuss or even consider Borden's views on how to manage the business.

95. When Moore does respond to Borden, it is often in a condescending or dismissive manner.

96. Not only has Moore been unwilling to discuss key joint decisions with Borden, but Moore also frequently engages in unilateral decision making.

97. Moore has cited the Sale Authority Provision to attempt to monopolize management of the business and to frustrate Borden's efforts to jointly manage the business.

98. The resulting dysfunction and Moore's domineering managerial style have not only led to various disputes between the Managers, including several that constitute major actions related to the governance and operation of PGEM, but have caused a breakdown in their ability to work together as partners in the business.

**Notice of Disagreement**

99. In order to protect his interests, on April 20, 2026, Borden sent Moore a formal notice of disagreement under Section 12.01 of the PGEM Operating Agreement ("***April 20 Notice***

***of Disagreement***" or "***Notice***"). A true and correct copy of the April 20 Notice of Disagreement is attached as Exhibit C.

100. The Notice raised four categories of dispute, each one involving a major action for the PGEM business: (1) Moore's refusal to engage a professional management company despite chronic operational dysfunction and Borden's request to do so; (2) Moore's unilateral management, including the hiring of a new general manager and the use of consultants to manage areas of the business beyond the scope of their qualifications without Borden's approval, and resulting staff departures caused by Moore's management style; (3) Moore's refusal to pursue or even consider alternative financing for the business's capital needs; and (4) Moore's failure to address critical maintenance, upkeep and improvements to 41 North's physical plant and buildings while refusing even to review the engineering studies Borden commissioned. *See* Ex. C.

101. Each of these disputes involves major management actions requiring joint approval under the PGEM Operating Agreement, and each remains unresolved despite Borden's efforts to address them through the contractual deadlock process.

***Major Dispute Over Professional Management***

102. Borden has proposed hiring a professional management company to run the business, recruit and retain personnel and address the operational dysfunction caused, in large part, by Moore's management of personnel.

103. Moore refuses to even discuss these issues. Instead, Moore makes material management decisions without Borden's approval.

***Major Dispute Over Personnel Issues***

104. Borden's desire to have professional management take over day-to-day control of the business is tied to a dispute over Moore's continued involvement in personnel-related decisions

and management of employees. Borden contends that Moore is not suited to manage PGEM's employees.. Moore's micromanagement of staff has caused significant turnover, damaging the business. Over 300 full-time employees have come and gone over the past ten years, including managers, executive chefs and other high-level staff.

105. The Company's former executive chef, subsequent interim chef, former hotel manager, controller and other employees have all attributed their departures or concerns to Moore's management style. Employees have described an environment of excessive micromanagement that makes success impossible and drives staff turnover. In or around March 2026, a key management member resigned not for better compensation or another job offer, but solely because the working conditions under Moore had become intolerable.

106. There is also a major dispute over Moore's use of two individual consultants to manage key aspects of the PGEM business. The consultants were hired at different times and are unaffiliated with each other. One of the consultants was retained to consult on food and beverage operations, while the other consultant was hired to advise on social media engagement. Moore has expanded their mandates substantially, to the point where he now manages the business and the staff through them, and Borden objects to this management structure. Borden has so advised Moore, but Moore refuses to acknowledge the objection and continues to utilize the consultants to direct the staff.

107. Moore's use of consultants has deprived Borden of his joint management rights and resulted in issues with other personnel. Key management staff find the consultants ineffective and difficult. Moore delegates tasks to the consultants beyond the scope of what they are qualified to do, such as handling Human Resource issues, hiring for key positions, reviewing employee "complaints" and providing opinions on engineering and other physical plant matters.

108. There is also a major dispute regarding Moore's unilateral decision making. For instance, in or around February 2026, Moore directed one of the consultants to hire a new general manager without Borden's input or approval. Borden was not given an opportunity to review the candidate's qualifications or meet the candidate before the hiring decision was made.

***Major Dispute Regarding Financing***

109. PGEM's credit facility with Citizens Bank matures in December 2026.

110. Borden has repeatedly, going back more than a year, expressed his desire not to refinance or extend the current facility with Citizens, and has proposed considering alternative financing, pursuing additional investors or conducting a leveraged recapitalization.

111. Moore has utterly refused to consider those alternatives or engage in discussions regarding the issue, instead plowing ahead toward an amendment and extension with Citizens. Consequently, a major dispute exists with respect to how to finance PGEM's capital needs.

***Major Dispute Over Maintenance, Upkeep and Improvements***

112. Borden believes that deferred maintenance has accumulated for the 41 North property that needs to be addressed.

113. Borden has told Moore that PGEM needs a multiyear master plan for the property involving investments in the millions of dollars and that there are several deferred maintenance items that require immediate attention to ensure that they do not turn into more costly failures. These include the kitchen's HVAC system and exhaust, which affect staff safety, comfort and retention, as well as the hotel's marina, driveway, roofing of a building and general upkeep.

114. With respect to the kitchen, Borden commissioned an engineering study in 2019 and asked Moore for consent to address the issues, but Moore refused to give consent or even to review the study.

115. The kitchen ventilation and heat problems have contributed to staff turnover, as employees complained about uncomfortably hot working conditions on the cooking line. Borden asked again to remedy the problem in 2025, but Moore refused to address the issues and instead stated that he would rely on his two consultants, neither of whom is qualified to provide advice on these issues. Moore, through his consultants, has only agreed to a temporary fix for the air conditioning and refuses to consider a more permanent solution.

**Borden Complies with Section 12.01 of the PGEM Deadlock Provision**

116. Borden sent the Notice of Disagreement on April 20, 2026. *See* Ex. C.

117. Moore did not respond to the April 20 Notice of Disagreement within the period specified in Section 12.01.

118. On May 22, 2026, Borden proposed mediation and suggested a well-regarded JAMS mediator, as contemplated under Section 12.01, stating that he would also be amenable to a retired Delaware Chancery judge.

119. Moore still refused to engage substantively with Borden's Notice or the disputes identified therein. On June 16, 2026, Moore rejected Borden's request for mediation.

120. On June 19, 2026, Borden again demanded mediation as set forth under Section 12.01 and invited Moore to identify a qualified mediator, while reserving his rights to pursue all available remedies should Moore continue to dodge Borden's attempts to mediate in compliance with the Deadlock Provision.

121. On June 29, 2026, Moore finally agreed to mediation but conditioned his participation on Borden's withdrawal of the April 20 Notice of Disagreement and refused to agree that the mediation would satisfy Section 12.01.

122. Borden agreed to proceed with a mediation and to pause dissolution under the PGEM Operating Agreement pending such mediation.

123. The parties participated in a face-to-face mediation session before former Chancellor William B. Chandler III on August 3, 2026.

124. Borden made a good-faith effort to reach a resolution of the management disputes through mediation that would provide a clear path to his exit from the partnership.

125. The mediation before Chancellor Chandler did not resolve the disputes.

126. While the parties continued to attempt to resolve their dispute through Chancellor Chandler after the face-to-face mediation session failed, those discussions did not progress, and on August 19, 2026, Borden renewed the April 20 Notice of Disagreement ("***Renewed Notice***") and notified Moore that he considered the ongoing mediation with Chancellor Chandler to satisfy the mediation requirement of Section 12.01 of the PGEM Operating Agreement. Borden gave Moore seven days to object to the Chandler mediation fulfilling the Section 12.01 requirement and, if he so objected, to propose an alternate JAMS mediator. A true and correct copy of the Renewed Notice is attached as Exhibit D.

127. The Renewed Notice identified unresolved disputes over professional management, key personnel, refinancing or alternative funding, and capital needs and safety improvements.

128. These disputes are quintessential managerial issues that constitute disagreements over major actions and thus support dissolution under Section 12.01.

129. The mediation before Chancellor Chandler was sufficient to satisfy the mediation component of Section 12.01. Although he believes holding a second mediation to address the same dispute would be needlessly duplicative, Borden nonetheless offered to participate in an additional JAMS mediation if Moore insisted. *See* Ex. D.

130. On August 27, 2026, Moore rejected the Renewed Notice and demanded that Borden withdraw it, refusing to accept the consequences of the unresolved deadlock. Moore never proposed a JAMS mediator.

131. While Borden continued discussions through Chancellor Chandler until Ocotber 19th, he did not withdraw the Renewed Notice and he treated the mediation with Chancellor Chandler as the mediation pursuant to the PGEM Operating Agreement.

132. Borden satisfied all obligations under the Deadlock Provision, including by mediating the disputes pursuant to the PGEM Operating Agreement. The mediation stalled and did not settle the parties' disputes, and the deadlock between them remains.

133. On September 29, 2026, Borden sent Moore a letter invoking Sections 12.01 and 15.01(b) of the PGEM Operating Agreement to begin the next required step of dissolution. Borden proposed that the Managers appoint Borden as the Member-liquidator under Section 15.02.

134. Moore responded on October 5, 2026 and rejected Borden's invocation of PGEM's dissolution procedure and the appointment of Borden as the Member-liquidator.

135. Moore's personal attachment has caused him to resist dissolution, even when the PGEM Operating Agreement and its deadlock provision, the drafting of which Moore specifically directed, mandate dissolution upon unresolved deadlock.

136. Under Section 12.01, Borden is entitled to a declaration of dissolution.

**616 Notice of Disagreement and Compliance with the 616 Deadlock Provision**

137. Due to the increasing dysfunction in the Partnership, Moore's refusal to work with Borden to resolve the Partners' disputes and the existence of excess balance sheet cash at 41 North, Borden determined that maintaining 616 was no longer necessary.

138. On August 19, 2026, Borden requested Moore's written consent under the 616 Operating Agreement to dissolve 616 pursuant to Section 15.01(a), to distribute 616's assets to its

members under Section 15.02 and to have Borden and Moore act as liquidators. A true and correct copy of the August 19 letter is attached as Exhibit E.

139. Borden exercised his equal co-management rights under the 616 Operating Agreement when he requested Moore's consent to dissolve 616 and distribute its assets.

140. Moore refused consent on August 27, 2026 and indicated that he would treat a dispute regarding 616 as part of the ongoing mediation before Chancellor Chandler.

141. On September 10, 2026, Borden delivered a written Notice of Disagreement under Section 12.01 of the 616 Operating Agreement ("***616 Notice of Disagreement***"). A true and correct copy of the 616 Notice of Disagreement is attached as Exhibit F.

142. The 616 Notice of Disagreement identified the disagreement over dissolution and distribution of 616's assets and stated that Borden would treat the parties' recent mediation before former Chancellor Chandler as the mediation contemplated by Section 12.01. *See* Ex. F.

143. Borden invited Moore to object immediately and, if Moore insisted on a separate JAMS mediation, to identify a proposed mediator. *Id.*

144. Moore refused to engage substantively with the 616 Notice of Disagreement or the dispute identified therein.

145. The 616 dispute concerns dissolution and distribution to 616's Members.

146. This dispute is a quintessential managerial issue that constitutes a disagreement over major actions and thus supports dissolution under Section 12.01.

147. On September 29, 2026, Borden sent Moore a letter invoking Sections 12.01 and 15.01(b) of the 616 Operating Agreement to begin the next required step of dissolution. Borden proposed that the Managers appoint Borden as the Member-liquidator under Section 15.02.

148. Moore responded on October 5, 2026 and implicitly agreed that the 616 dispute was addressed as part of the mediation before Chancellor Chandler. In the same letter, however, Moore rejected Borden's invocation of 616's dissolution procedure and the appointment of Borden as the Member-liquidator.

149. Borden satisfied his obligations by requesting dissolution, giving written notice, participating in mediation, and offering a further mediation opportunity.

150. The mediation before Chancellor Chandler satisfied the mediation component of Section 12.01. Borden nonetheless offered to participate in an additional JAMS mediation if Moore insisted, but Moore never suggested any JAMS mediation. *See* Ex. F.

151. Moore's personal attachment has caused him to resist dissolution, even when the 616 Operating Agreement and its deadlock provision, the drafting of which Moore specifically directed, mandate dissolution upon unresolved deadlock.

152. As of the filing of this Complaint, Moore has refused to dissolve 616, the parties have not resolved their disagreement and 616 remains subject to the contractual dissolution and winding-up provisions in the 616 Operating Agreement.

**COUNT I**
**Declaratory Judgment for Dissolution of PGEM under 28 U.S.C. § 2201**

153. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

154. An actual controversy exists because Plaintiff contends that the PGEM Operating Agreement requires dissolution after an unresolved major-action deadlock, while Defendant contends that no major disputes exist and thus dissolution is not warranted.

155. The April 20 Notice of Disagreement was written, delivered to Defendant, and identified multiple unresolved major actions within the scope of Section 12.01 of the PGEM Operating Agreement.

156. Plaintiff renewed and supplemented that April 20 Notice on August 19, 2026 after unsuccessful attempts to resolve the disputes through mediation.

157. The disputes identified in the April 20 Notice and renewed Notice constitute disagreements over major actions proposed to be taken.

158. The management disputes at issue do not constitute decisions to sell all or substantially all assets, sell membership interests or change PGEM's purpose.

159. Plaintiff performed the obligations imposed on him by Section 12.01 and is seeking the contractual remedy to which the Partners previously agreed.

160. Defendant's attempts to brush aside Plaintiff's position and refusal to engage in the process do not erase the unresolved disputes or the written notices.

161. The failed mediation before Chancellor Chandler satisfied the mediation conditions of Section 12.01.

162. The August 19 renewed Notice satisfied or excused any remaining mediation condition.

163. Under Sections 12.01 and 15.01(b) of the PGEM Operating Agreement, the unresolved deadlock triggered PGEM's contractual dissolution event.

164. Plaintiff therefore seeks a declaration that: (a) the April 20 Notice of Disagreement and August 19 renewed Notice are valid; (b) the identified disputes involve major actions subject to Section 12.01; (c) the mediation requirement was satisfied, excused or rendered futile by Defendant's refusal to proceed; (d) Defendant's limited final authority does not apply; (e) PGEM

must be dissolved under Sections 12.01 and 15.01(b); and (f) PGEM must be wound up, liquidated and distributed under Section 15.02 and applicable Delaware law.

**COUNT II**
**Declaratory Judgment for Dissolution of 616 under 28 U.S.C. § 2201**

165. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

166. An actual controversy exists because Plaintiff requested 616's dissolution and distribution, Defendant refused consent, and Defendant disputes Plaintiff's right to invoke the dissolution process under Sections 12.01 and 15.01 of the 616 Operating Agreement.

167. The August 19, 2026 request complied with Section 15.01(a) and sought distributions under Section 15.02.

168. Defendant's August 27, 2026 refusal created a disagreement over a major action contemplated by Section 12.01.

169. Plaintiff then delivered the September 10, 2026 Notice of Disagreement pursuant to Section 12.01, treated the recent Chancellor Chandler mediation as the required mediation and invited Defendant to identify any different JAMS mediator immediately.

170. The parties' mediation before Chancellor Chandler failed to resolve the 616 dispute.

171. Plaintiff satisfied every obligation required of him by treating the 100-day period as a mediation window, participating in mediation, offering a further mediation opportunity and preserving his request for dissolution and distribution.

172. Defendant's authority under the 616 Funding Authority Provision does not include authority over a decision to dissolve 616 and distribute its assets to 616's Members.

173. Defendant's authority under the 616 Funding Authority Provision covers only a decision to distribute or lend funds to PGEM, 802 Partners, LLC or Forty 1° North, LLC.

174. Plaintiff therefore seeks a declaration that: (a) the August 19 request and September 10 Notice are valid; (b) the identified dispute involves major action within Section 12.01; (c) the mediation requirement was satisfied, excused or rendered futile by Defendant's refusal to proceed; (d) Defendant's limited final authority does not apply; (e) 616 must be dissolved under Sections 12.01 and 15.01(b); and (f) 616 must be wound up, liquidated and distributed under Section 15.02 and applicable Delaware law.

## COUNT III
## Declaratory Judgment to Declare Defendant's Unilateral Management Actions Unauthorized under 28 U.S.C. § 2201

175. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

176. An actual controversy exists over whether Defendant's unilateral exercise of management authority over Plaintiff's objection falls within the scope of his authority under the PGEM Operating Agreement.

177. Section 9.02(a) of the PGEM Operating Agreement provides that "[t]he management of the business and affairs of the Company shall be the sole and complete responsibility of the Managers" and that, "[e]xcept as otherwise provided in Section 12.01 herein, any action of the Managers shall require the unanimous approval of the Managers."

178. Section 12.01 of the PGEM Operating Agreement confers upon Defendant final decision authority only with respect to the sale of the Company or a change in its purpose. No provision of the PGEM Operating Agreement grants Defendant unilateral authority over personnel decisions, the hiring of a general manager, or the engagement or direction of consultants.

179. Plaintiff did not delegate his authority to participate in the evaluation and hiring of key personnel to Defendant.

180. In or around April 2026, Defendant unilaterally hired a new general manager for 41 North without Plaintiff's knowledge, input or approval. Plaintiff was not given an opportunity to review the candidate's qualifications or meet the candidate before the hiring decision was made.

181. Additionally, Defendant has re-tasked third-party consultants to manage key aspects of the PGEM business. Plaintiff objects to the use of these consultants for this purpose and has so advised Defendant, but Defendant refuses to acknowledge Plaintiff's objection or obtain Plaintiff's approval for the continued use of such consultants.

182. Defendant's unilateral actions in hiring the general manager and re-purposing the consultants constitute management decisions requiring unanimous approval of the Managers under Section 9.02(a) of the PGEM Operating Agreement.

183. Defendant's unilateral management actions do not fall within his limited authority under the Sale Authority Provision, which pertains only to the sale of the Company or a change in its purpose.

184. A judicial declaration is necessary to resolve the parties' dispute over the scope of Defendant's management authority and to clarify Plaintiff's rights under the PGEM Operating Agreement.

185. Plaintiff therefore seeks a declaration that: (a) under Section 9.02(a) of the PGEM Operating Agreement, management decisions, including personnel decisions and the hiring and direction of senior employees and consultants, require unanimous approval of the Managers; (b) Defendant's limited final-decision authority under Section 12.01 does not extend to such management decisions; (c) Defendant's unilateral hiring of the general manager exceeded his

authority under the PGEM Operating Agreement and is improper; and (d) Defendant's continued use of consultants over Plaintiff's objection exceeds his authority under the PGEM Operating Agreement and is improper and without legal effect.

## COUNT IV
**Breach of Contract (PGEM Operating Agreement) and Specific Performance**
***Plaintiff v. Defendant Moore***

186. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

187. The PGEM Operating Agreement is a valid and binding contract between the parties.

188. Under Sections 12.01 and 15.01(b), unresolved deadlock requires dissolution, and Section 15.02 requires the Managers to wind up PGEM and make final distributions.

189. Plaintiff performed his contractual obligations by giving notice, pursuing the agreed dispute-resolution steps, participating in mediation and seeking to carry out the PGEM Operating Agreement's dissolution mechanism after the disputes remained unresolved.

190. Defendant breached the PGEM Operating Agreement by refusing to recognize and carry out PGEM's dissolution after the contractual dissolution event occurred.

191. Defendant's refusal has prevented the Managers from appointing or acting through liquidators, completing the required accounting, distributing assets and filing the certificate of cancellation.

192. Defendant's refusal continues to deprive Plaintiff of the contractual benefit of dissolution and winding up.

193. Specific performance is appropriate because PGEM's assets, governance rights and contractual dissolution process are unique, and monetary damages alone cannot provide Plaintiff the dissolution, liquidation and distribution required by the PGEM Operating Agreement.

194. Plaintiff requests an order requiring Defendant to recognize PGEM's dissolution, cooperate in appointing a liquidator, cause the required accounting and distribution, execute all documents necessary to wind up PGEM and file or cause the filing of the certificate of cancellation.

## COUNT V
**Breach of Contract (616 Operating Agreement) and Specific Performance**
***Plaintiff v. Defendant Moore***

195. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

196. The 616 Operating Agreement is a valid and binding contract between the parties.

197. Under Sections 12.01 and 15.01(b), unresolved deadlock requires dissolution, and Section 15.02 requires the Managers to wind up 616 and make final distributions.

198. Plaintiff performed his contractual obligations by requesting dissolution and distribution, giving written notice under Section 12.01, participating in mediation and seeking to carry out the 616 Operating Agreement's dissolution mechanism after the disputes remained unresolved.

199. Defendant breached the 616 Operating Agreement by refusing to recognize and carry out 616's dissolution after the contractual dissolution event occurred.

200. Defendant's refusal has prevented the Managers from appointing or acting through liquidators, completing the required accounting, distributing assets and filing the certificate of cancellation.

201. Defendant's refusal continues to deprive Plaintiff of the contractual benefit of dissolution and winding up.

202. Specific performance is appropriate because 616's assets, governance rights and contractual dissolution process are unique, and monetary damages alone cannot provide Plaintiff the dissolution, liquidation, and distribution required by the 616 Operating Agreement.

203. Plaintiff requests an order requiring Defendant to recognize 616's dissolution, cooperate in appointing a liquidator, cause the required accounting and distribution, execute all documents necessary to wind up 616 and file or cause the filing of the certificate of cancellation.

**COUNT VI**
**Breach of Contract (PGEM Operating Agreement) for Unilateral Management**
***Plaintiff v. Defendant Moore***

204. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

205. The PGEM Operating Agreement is a valid and binding contract between the parties.

206. Under Section 9.02(a) of the PGEM Operating Agreement, "any action of the Managers shall require the unanimous approval of the Managers," except as otherwise provided in Section 12.01.

207. The Sale Authority Provision of Section 12.01 grants Defendant final-decision authority only with respect to the sale of the Company or a change in its purpose. Personnel decisions, hiring of employees and engagement of consultants are not within the scope of Defendant's final-decision authority.

208. Defendant breached the PGEM Operating Agreement by unilaterally hiring a new general manager in or around April 2026 without Plaintiff's knowledge, input or approval, in violation of the unanimous-approval requirement of Section 9.02(a).

209. Defendant further breached the PGEM Operating Agreement by engaging and continuing to use consultants to manage key aspects of the PGEM business over Plaintiff's express objection, in violation of the unanimous-approval requirement of Section 9.02(a).

210. Defendant's breaches are material in that they deprive Plaintiff of his contractual right to co-manage the business and affairs of PGEM on an equal basis with Defendant.

211. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages, including but not limited to the loss of his contractual right to participate in management decisions affecting PGEM and such other consequential damages as may be proven at trial.

212. Plaintiff is entitled to recover general, direct and consequential damages arising from Defendant's breaches, together with costs of suit and such other relief as the Court deems just and proper.

## COUNT VII
### Declaratory Judgment to Declare Unenforceable Defendant's Sole Sale Authority under 28 U.S.C. § 2201

213. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

214. An actual controversy exists over whether Defendant's final-decision authority pursuant to the Sale Authority Provision is enforceable.

215. The Sale Authority Provision is unenforceable due to undue influence based on the confidential relationship between Plaintiff and Defendant.

216. The PGEM Operating Agreement and Sale Authority Provision therein arose from a confidential relationship.

217. Defendant, as a lawyer who drafted the provision and controlled the negotiation process, stood in a confidential and superior position to Plaintiff, who was a non-lawyer without independent representation and who relied on Defendant's legal experience and advice.

218. Based on the nature of the Partners' relationship, Plaintiff had justifiable belief that the Defendant would not act contrary to Plaintiff's interests.

219. The provision was drafted in consultation with Defendant, who was in a confidential relationship with Plaintiff, and benefits Defendant at the expense of the trusting counterparty, Plaintiff.

220. The provision is therefore presumptively unenforceable because it was not the product of full disclosure.

221. In the alternative, the Sale Authority Provision is unconscionable and thus unenforceable.

222. The provision is substantively unconscionable because it vests Defendant with terms that are so one-sided and favorable as to be oppressive. The provision grants Defendant an enhanced, sole right, for which he paid no additional consideration, and which carries with it no corresponding or offsetting protections for Plaintiff.

223. The provision is procedurally unconscionable because the inequality of bargaining power between Defendant and Plaintiff deprived Plaintiff of any meaningful choice. The provision was drafted in a process controlled by Defendant—a lawyer—while Plaintiff was unrepresented, and the full scope and consequences of the provision were never disclosed or explained to Plaintiff. Plaintiff reasonably relied on Defendant, who had handled legal issues for the Partners and the business and who had advised Plaintiff personally, to ensure the bargain was fair.

224. An unconscionable provision is unenforceable.

225. Plaintiff seeks a declaration that the Sale Authority Provision is unenforceable due to an abuse of confidential relationship under which it was drafted or, in the alternative, unconscionability.

226. In the alternative, the Court should construe the Sale Authority Provision narrowly to cover only the decision to actually consummate a sale or change PGEM's purpose, not preliminary decisions or events that *might* eventually result in a sale, such as management disputes, deadlock, dissolution, the exploration of investor interest or the consideration of bona fide offers. The Court should declare that disputes relating to operational and financial issues such as those at

issue here, which according to the contractual terms may lead to deadlock and, ultimately, dissolution, do not fall within Defendant's final authority.

**COUNT VIII**
**Breach of Implied Covenant of Good Faith and Fair Dealing (PGEM Operating Agreement)**
***Plaintiff v. Defendant Moore***

227. Plaintiff incorporates the preceding paragraphs as though fully set forth at length herein.

228. The Sale Authority Provision gives Defendant discretion over whether to sell, but that discretion does not permit arbitrary or unreasonable conduct that defeats the reasonable benefit of Plaintiff's bargain as an equal Member and Manager.

229. Defendant's arbitrary exercise of unilateral sale authority deprived Plaintiff of his contractual management rights and the benefit of his bargain under the PGEM Operating Agreement.

230. Defendant refused to engage with potential sale opportunities, did not request information, did not solicit terms, and did not establish a process for evaluating them.

231. Defendant's refusal was not a good-faith exercise of his sole sale discretion.

232. Defendant acted in bad faith and used the authority to preserve his personal control over 41 North and to avoid a transaction that would end or reduce that control, without regard for the best interests of the Partners.

233. Defendant abused his discretionary authority in bad faith in an effort to maintain his personal legacy.

234. Defendant's conduct deprived Plaintiff of the benefit of an agreement that placed Plaintiff in a 50/50 company with a contractual opportunity for the Company and its Members to consider strategic alternatives.

235. Plaintiff has suffered damages and seeks equitable relief, nominal or compensatory damages, and any other relief allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Peter M. Borden respectfully requests that the Court enter judgment in his favor and against George W. Moore and the Nominal Defendants and grant the following relief:

a. Declare the rights and obligations of the parties under the Operating Agreements; declare that PGEM and 616 must be dissolved under their respective operating agreements; and order the winding up, liquidation, accounting, distribution and cancellation of each company as required by the applicable agreements and Delaware law.

b. Appoint Plaintiff or a qualified third party as liquidator to conduct such dissolution and winding up.

c. Order Defendant to perform his contractual obligations described in the PGEM Operating Agreement, including specific performance of PGEM's dissolution and winding up.

d. Preserve the status quo between the parties by enjoining Defendant from taking any action to transfer, encumber, dissipate or dispose of PGEM or 616 assets; from altering the existing purpose, management or operational structure of PGEM, 616, or 41 North; from terminating, modifying or interfering with Plaintiff's rights under the Operating Agreements; and from taking any other action that would render ineffectual any judgment or relief to which Plaintiff may be entitled.

e. Award compensatory, nominal and other damages proven at trial; award pre- and post-judgment interest; award attorneys' fees and costs under the agreements and applicable law; and grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: October 20, 2026

FAEGRE DRINKER BIDDLE & REATH LLP
/s/ *Timothy D. Katsiff*
Timothy D. Katsiff (PA ID No. 75490)
Emma C. Meister (PA ID No. 338495)
One Logan Square, Ste. 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
timothy.katsiff@faegredrinker.com
emma.meister@faegredrinker.com

*Attorneys for Plaintiff Peter M. Borden*